UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 01-CV-0581 (JFB)

———————————

MARY W. CARLSON,

Plaintiff,

VERSUS

PRINCIPAL LIFE INSURANCE CO.,

Defendant.

———————————

MEMORANDUM AND ORDER
September 28, 2006

———————————

JOSEPH F. BIANCO, District Judge:

This is an action governed by the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Plaintiff Mary Carlson brings suit against defendant Principal Life Insurance Company ("Principal"), seeking to increase annuity benefits she is allegedly due pursuant to a Group Annuity Contract. A three-day bench trial commenced on May 10, 2006. Based on the record presented by the parties, and in accordance with Rule 52 of the Federal Rules of Civil Procedure, the following constitutes this Court's findings of fact and conclusions of law finding in favor of Principal.

I. PROCEDURAL HISTORY

This action was commenced on January 31, 2001, by plaintiff Mary Carlson (hereinafter "Mary") against defendants Principal and Eileen Carlson (hereinafter "Eileen"). In its answer, Principal asserted a cross-claim against Eileen. By a decision dated November 28, 2001, the Honorable Jacob Mischler dismissed the case for lack of subject matter jurisdiction. On February 12, 2003, the Second Circuit reversed and remanded the matter to the District Court. *See Carlson v. Principal Financial Group*, 320 F.3d 301 (2d Cir. 2003). In its remand decision, the Second Circuit "offer[ed] some guidance to assist the District Court's analysis on remand:"

> In determining whether Mary can state an ERISA claim against Principal, the District Court will have to consider several questions, including (1) whether Principal is a proper defendant under ERISA and (2) whether the Nationar Plan had been terminated at the time Principal allegedly breached its obligation to provide Donald with the certificate, such that there was no ERISA plan in existence at that time.

*Id.* at 307. The case was reopened on March 10, 2003 and, on March 23, 2003, the matter was reassigned to the Honorable Leonard D. Wexler. By stipulation filed August 10, 2003, and so ordered on September 15, 2003, Mary dismissed all claims against Eileen. Principal then filed an amended answer to assert a third-party claim against Eileen. Eileen filed a motion to dismiss the third party complaint, which was denied by Order dated September 21, 2004. The parties subsequently filed cross-motions for summary judgment, which were denied by Memorandum and Order dated August 16, 2005. On February 9, 2006, this case was re-assigned to the undersigned. A three-day bench trial was held beginning May 10, 2006, and the parties had the opportunity to examine witnesses and submit relevant documentary evidence. At the bench trial, defendant/third party plaintiff Principal stipulated to the dismissal of its claims against third-party defendant Eileen. The parties' proposed findings of fact and conclusions of law were submitted on June 14, 2006, and closing arguments were heard on June 29, 2006. The Court heard supplemental argument on July 13, 2006, by telephone. Having reviewed the submissions and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law, pursuant to Fed. R. Civ. P. 52(a) and 65.

II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. THE GROUP ANNUITY CONTRACT

Donald Carlson began employment with Savings Bank Trust Company (which would later be renamed Nationar) (hereinafter "Nationar") on August 10, 1936. (First Stipulation of Facts ordered on December 20, 2005, ¶ 3 (hereinafter "First Stip.")) Donald and former defendant/third party defendant Eileen were married on March 1944. (*Id.* ¶ 5.) Eileen has a birth date of October 4, 1918. (*Id.* ¶ 1.) Donald and Eileen entered into a legal separation agreement on September 18, 1970, and were divorced on November 2, 1972. (*Id.* ¶¶ 6-9.) Donald and Mary were married on November 5, 1972. (*Id.* ¶ 10.) Mary was born on May 14, 1937. (*Id.* ¶ 4.) Donald retired from Nationar on March 31, 1983, and began receiving a pension benefit of $2,795.02 per month from Nationar on April 1, 1983. (*Id.* ¶¶ 11-12.)

In connection with the termination of the Nationar retirement plan, bids were solicited for a single premium guaranteed annuity. (First Stip. ¶ 13.) By letter dated July 16, 1993 from William M. Mercer Asset Planning, Inc. ("Mercer"), Principal was invited to bid on the issuance of "a non-participating single premium group annuity contract to settle the retirement benefits accrued under the Nationar Retirement Plan[,] which is being terminated." (Second Stipulation of Facts ordered on May 15, 2006, at ¶ 1 (hereinafter "Second Stip.")) The July 16, 1993 letter enclosed census data that identified each Nationar Retirement Plan participant for whom an annuity was to be purchased, as well as the type of annuity

benefit, and the amount of the annuity. (*Id.* at 2, Def.'s Ex. 1A.) Nationar sought to purchase a joint survivor annuity for Donald J. Carlson, a male, born May 14, 1919, in the monthly amount of $2,795.02, which monthly amount would continue following the decedent's death to a female born October 4, 1918. (*Id.* ¶ 4.) This date of birth matched Eileen, not Mary. Pricing of the annuity is based upon life expectancy and, as such, the date of birth and gender of the co-annuitant, but not the name of the co-annuitant, are relevant. (Tr. at 386-387.)[1] Principal relied upon the census information provided by Mercer in preparing the bid and determining the costs. (Tr. at 388.) On July 29, 1993, Principal submitted a proposal for the issuance of such annuity. (First Stip. ¶ 13.) By letter dated September 9, 1993, Mercer advised Principal that Nationar agreed to accept Principal's bid to issue the annuity in exchange for $7,878,800. (Second Stip. ¶ 7.) On September 16, 1993, Nationar sent to Principal via facsimile, a document dated September 14, 2006, certifying that the census data previously provided was accurate. (Second Stip. ¶ 11, Ex. N.) Separately, Nationar sent a letter on September 16, 1993, authorizing Principal to make the October 1, 1993 payments directly to the annuitants in pay status. (*Id.* ¶ 11, Ex. O.) A notice was sent to the Pension Benefit Guaranty Corporation on February 14, 1994. (First Stip. ¶ 15.) On March 8, 1994, Mercer wrote to Principal informing Principal that it had reviewed the annuity contract and had concluded that it complied with the specification in the original July 16, 1993 letter. (Second Stip. ¶ 13, Ex. P.) On May 26, 1994, Nationar executed the application for the group annuity contract. (Second Stip. ¶ 15, Ex. Q.) By letter dated June 29, 1994, Principal advised Nationar that certain items were needed as specified in the correspondence before certificates could be mailed to the annuitants. (Second Stip. ¶ 17.) On November 4, 1994, Principal issued a Group Annuity Contract, which was retroactively effective from September 1, 1993. (*Id.* ¶ 17.) As of October 1, 1993, Principal paid Donald's benefits of $2,795.02 per month. (*Id.* ¶ 19.)

Donald died on September 30, 1995. (*Id.* ¶ 20.) Eileen and Mary both requested survivor benefits. (*Id.* ¶ 21.) By letter dated August 3, 1999, Principal told Mary that, "Under the terms of our contract[,] Ms. Eileen Carlson was entitled to receive 100% of the survivor annuity benefits." (*Id.* ¶ 22, Ex. F.)

Eileen's son-in-law provided a copy of the Property Settlement Agreement and Judgment for Divorce entered into by Eileen Carlson and Donald. The Agreement explicitly addresses Donald's retirement benefits in paragraph 8:

> The Husband is presently employed by Savings Banks Trust Company and will be entitled to certain benefits upon his retirement, earlier death or termination of employment under the Retirement Plan administered by the Savings Banks Retirement System. To the extent he is eligible to elect such an option, the Husband shall select an option upon retirement, earlier death or termination of employment payable first to himself, so long as he survives, and thereafter to his wife for her life, unless he has remarried and is survived by another wife at the time of his death. Upon

---

[1] References to "Tr." are to the transcript of the bench trial that commenced on May 10, 2006.

3

such occasion, the wife and surviving other wife shall share and share alike in the annuity as is actuarily determined by the Savings Banks Retirement System. Until such time as the Husband retires or otherwise becomes entitled to retirement benefits, he shall name the minor children to be the recipient of retirement benefits hereunder in lieu of the wife to the extent if any that the wife is ineligible to receive such benefits. The obligation of the husband hereunder to name the wife as described above shall terminate upon her remarriage or death during the lifetime of the Husband.

(Stipulation ¶¶ 6-7 and Pl. Ex. 36.)

Principal also received an Application for Retirement Benefits and Election of Benefits Payment form which allegedly was executed by Donald on March 1, 1983, pursuant to which Donald applied for a Special Benefit Payment Form, to wit:

Special Benefit Payment Form -
(If you wish a Benefit Payment Form other than one of those set forth above, the Employee Benefits Committee will ascertain whether such form (in language to be inserted below) is acceptable to the trustees of the System.)

Special 100% Joint and Survivor. A reduced benefit payable to me for my lifetime with the provision that in the event of my death $1,397.51 per month will be continued to each of the designated beneficiaries set forth under Item 3(d) for their lifetimes should they survive me. In the event that I am survived by only one of the designated beneficiaries such survivor will be entitled to $2,795.02 per month for her lifetime.

Paragraph 3(d) provides:
Beneficiary to Whom Any and All Benefits on My Behalf Are to Be Paid by System upon My Death Following Retirement . . .

* * *

d. Special Beneficiary Designation

Mary W. Carlson (born 5/14/37)
Eileen Carlson (born 10/4/18)

(Pl.'s Ex. 33). The competing claims of Eileen and Mary were temporarily resolved based upon Eileen's voluntary willingness to accept 50% of the total monthly annuity payment. On November 24, 1995, Principal sent letters to Eileen and Mary, explaining that Eileen Carlson would be paid $1,397.51 per month for the remainder of her life, and Mary Carlson would be paid $1,007.55 per month for the remainder of her life. (*Id.* ¶ 24, Exs. G, H.) The amounts received by Eileen and Mary Carlson are actuarially equivalent, given each woman's respective age. (First Stip. ¶ 28.) By letters dated November 28, 1995 and December 7, 1995, Mary objected to receiving $1,007.55 per month. (Second Stip. ¶ 25.)

On February 16, 1996, Mary had a telephone conversation with Sandra Schaffer of Principal, at which time Mary advised that she would accept payment of the sum of $1,007.55 and requested said payments to be made. (Second Stip. ¶ 30.) Principal received no further communication regarding Mary's benefits until Mary's attorney contacted

4

Principal on May 4, 1998. (Second Stip. ¶ 30.)

On May 15, 1998, Principal received correspondence from Mary's counsel, asserting a claim seeking entitlement to be paid under the Group Annuity Contract. (Tr. at 402; Def.'s Ex. 12).

B.  MARY'S CLAIM UNDER ERISA

The Second Circuit advised that "Mary's ability to state a claim under ERISA remains an open question" that depends first, on whether Principal could be a proper defendant under Title I of ERISA and, second "whether the Nationar Plan was properly terminated."[2] *Carlson v. Principal*, 320 F.3d 301, 307 (2d Cir. 2003).

1. Under *Harris Trust*, Principal is Not a Proper Defendant Under ERISA

The Second Circuit has explicitly set forth in remanding this case, how the Court should determine whether Principal is a "proper defendant under § 502(a)(3)":

> Under *Harris Trust*, a non-fiduciary may be a proper defendant under § 502(a)(3) if it would be a proper defendant under the "common law of trusts" . . . for example, when it is "a transferee of ill-gotten trust assets . . . , and then only when the transferee . . . knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust." In other words, Principal may be a proper defendant under § 502(a)(3) if Mary can demonstrate that Principal "had actual or constructive knowledge of the circumstances that rendered [its] transaction [with Nationar] unlawful."

*Carlson*, 320 F.3d at 308 (quoting *Harris Trust & Savs. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250-251 (2000)). Mary argues that, pursuant to this test, Principal is a proper defendant under § 502(a)(3) because, Mary alleges, Principal had actual knowledge of the circumstances that rendered its transaction with Nationar unlawful. With respect to whether Principal is a proper defendant under ERISA, the Second Circuit further advised, "we raise the issue only to point out that, if Principal failed to provide Donald with the certificate then Principal may have had constructive knowledge of Nationar's error . . . [T]he District Court should consider whether . . . Principal [is] a proper defendant under *Harris Trust*." *Carlson*, 320 F.3d at 308.

In arguing that Principal is a proper defendant under ERISA because Principal allegedly had actual knowledge of the ERISA violation, Mary ignores the first prong of the *Harris Trust* test – that Principal must be "a transferee of ill-gotten trust assets." *Harris Trust*, 530 U.S. at 251; *accord Carlson*, 320 F.3d at 308. Mary does not allege that Principal was the transferee of "ill-gotten trust assets." It is undisputed that Principal issued a Group Annuity Contract in accordance with the written specifications and application provided by Nationar, which included the purchase of a single premium joint and survivor annuity for Donald Carlson, which would provide a monthly benefit of $2,795.02 for his life and a continued survivor benefit for a female born October 4, 1918. Principal

---

[2] Mary does not argue that Principal is a fiduciary. *See* Pl. Post-Trial Brief at 2-3, n.1.

5

received the exact money necessary to fund the Group Annuity Contract issued and has no ill-gotten trust assets. Accordingly, Principal is not a proper defendant under ERISA because Mary cannot demonstrate that Principal was the recipient of ill-gotten gains.[3]

Even assuming *arguendo* Principal had received "ill-gotten trust assets," the Court finds that Principal did not have actual or constructive knowledge of an unlawful transaction. The "transaction" at issue is the purchase by Nationar of a 100% survivor annuity for Donald's former spouse and none for his spouse. In 1983, at the time of Donald's retirement, 29 U.S.C. § 1055(a)(1)(1976) required that, unless waived by the participant, all pension plans providing benefits in the form of an annuity must provide such benefits to married participants "in a form having the effect of a qualified joint and survivor annuity." More specifically:

> The term "qualified joint and survivor annuity" means an annuity for the life of the participant with a survivor annuity for the life of his spouse which is not less than one-half of, or greater than, the amount of the annuity payable during the joint lives of the participant and his spouse and which is the actuarial equivalent of a single annuity for the life of the participant. and for no less than 50% of that annuity to be paid to the surviving spouse.

29 U.S.C. § 1055(g)(3)(1976). Mary argues that Principal learned of the circumstances allegedly rendering the transaction unlawful around October 1995, after Donald's death, when Principal discovered that the co-annuitants date of birth belonged to Donald's former spouse, Eileen, and not his current spouse, Mary. Mary alleges that Principal became an accomplice in the plan administrator's violation of ERISA when it ignored Nationar's alleged violation of ERISA. In sum, Mary argues that Principal had actual knowledge that Nationar had

---

[3] Mary seeks to introduce the deposition testimony of Peter Farago. Mr. Farago is an actuary who assisted the plan administrator in the preparation of notices of benefit commitments and certain filings with the PBGC in connection with the termination of the Nationar plan. (Farago Dep. at 4-5.) Principal objects to the admission of large portions of the deposition on the grounds of lack of foundation, lack of personal knowledge, hearsay and relevance and objects to the admissibility of all the exhibits marked during his deposition with the exception of the Form 500. The Court finds the deposition and corresponding exhibits, Pl.'s 93-96, admissible. Although Mr. Farago did not possess the original notice of benefit commitments that was prepared for Donald, he testified as to how the document was originally created and his participation in its creation. (Farago Dep. at 22-28.) However, admission of the Farago deposition does not support Mary's position. The Farago deposition demonstrates that Donald was sent a 60-day Notice before the termination of the Nationar Plan, as required by § 4041(a)(2), that lists Mary as his 100% co-annuitant. According to Mary, this demonstrates that it was not Nationar's intent to purchase a 100% survivor annuity for Eileen, and nothing for Mary. However, Nationar's intent at that time the annuity was purchased by Principal is not relevant to this action; rather, the issue is what was communicated to Principal. Mr. Farago had no communications with Principal with regard to the Nationar plan and Mr. Farago never informed Principal that there was a problem with the information submitted for the annuity issued on behalf of Donald. (Farago Dep. at 50-51.) Mr. Farago's testimony demonstrates nothing with respect to Principal's intent or knowledge. Accordingly, the Court finds this argument unavailing.

violated ERISA by purchasing a 100% survivor's annuity for a female with the date of birth of Donald's former spouse, and no benefit for Mary, Donald's current spouse, when Principal obtained Donald's pension application from Nationar on October 12, 1995. Mary admits, however, that at the time Principal sold the Group Annuity Contract to Nationar in 1994, "Principal had no knowledge of the 'circumstances that rendered the transaction unlawful.'" (Pl. Memo. of Law at 4.)

The Court is required to look to Principal's knowledge at the time the transaction took place. Accordingly, because it is undisputed that Principal did not have notice of any alleged breach at the time Principal was transferred the trust property, Mary has failed to demonstrate that Principal had actual knowledge of the unlawful transaction. *See McDannold v. Star Bank, N.A.*, 261 F.3d 478, 486 (6th Cir. 2001) ("[A] nonfiduciary is liable only for its 'knowing participation' in a fiduciary's breach."); *see also* Restatement (Second) of Trusts, § 284 ("If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.")

However, under *Harris Trust*, Mary does not have to show that Principal had *actual* knowledge of the allegedly unlawful transaction; rather, the second prong of *Harris Trust* may be satisfied by a showing that Principal had *constructive* knowledge of the allegedly unlawful transaction. Thus, the Second Circuit instructed that Principal "may have had constructive knowledge of Nationar's error" if Principal did not provide Donald with the annuity certificate. *Carlson*, 320 F.3d at 308. The Court finds, however, that plaintiff failed to demonstrate that the annuity certificate was not sent to Donald.[4]

a. Principal Mailed the Certificates as a Regular Business Practice

The documentation and testimony demonstrate that annuity certificates were mailed. By correspondence dated September 7, 1994, Principal sought from Nationar information concerning co-annuitants' names (Pl.'s Ex. 27). Karen Heathcoate, who has been employed by Principal since 1968, and whose position was Senior Underwriter during the relevant time period, testified that

---

[4] In *Harris Trust*, the Supreme Court held that "the transferee must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." 530 U.S. at 251. The Court further articulated in a footnote, "[t]he issue of which party, as between the party seeking recovery and the defendant-transferee, bears the burden of proof on whether the transferee is a purchaser for value and without notice, is not currently before us, but may require resolution on remand." *Id.* at 251, n.3. Thus, the Supreme Court has not ruled on who has the burden to demonstrate the transferee's knowledge. However, in remanding the instant action, the Second Circuit indicated that Mary has the burden by requiring Mary to demonstrate that Principal "had actual or constructive knowledge." *Carlson*, 320 F.3d at 308. Accordingly, the Court examines whether Mary demonstrates that Principal had constructive knowledge, and as such, it is Mary's burden to demonstrate that Principal did not provide the certificate. In any event, the Court finds that, even if Principal had the burden of demonstrating lack of actual or constructive knowledge, it has satisfied that burden.

7

it was Principal's regular business practice was to send out certificates as soon as possible after the annuity was ultimately signed and to continue to follow-up if Principal was in need of information to issue an annuity certificate. (Tr. at 236-240.) According to Heathcoate, the follow-up would occur at least once a month. (Tr. at 238.) Principal produced a computer log demonstrating that certificates were sent on October 15, 1994, based on an entry stating "mail certs to employees." (Pl.'s Ex. 1-P.) Heathcoate testified that, based on that computer entry, the annuity certificates were mailed on October 15, 1994. She testified that it was Principal's regular business practice to keep these type of records on the computer and that the entries would have been made as the event occurred.[5] (Tr. at 238.)

Heathcote further testified that Principal's regular business practice would have been to make a note of what certificates were not mailed. (Tr. at 238.) There is nothing in Principal's computer entry or file which evidences that they were not mailed to all individuals. (Tr. at 238). Because Principal did not retain copies of certificates at that time, there are no copies in Principal's files. (Tr. at 192.) It is the Court's finding that based on the testimony regarding Principal's business practice, had certificates not been provided, there would have been some indication in Principal's files or on the computer record.

### b. Donald's Records

Mary testified that, to her knowledge, Donald never received a certificate. (Tr. at 74.) The Court finds, however, that Mary has no actual knowledge of whether her husband received a copy of the annuity certificate. Mary testified that she telephoned Principal, at Donald's request, seeking the annuity certificates until at least January 1994. (Tr. at 88-89.) She also testified that she thought she made a couple of follow-up telephone calls after January 1994, before the end of the year, but that she did not know precisely when. (Tr. at 73, 88). Because the annuity certificates were sent on October 15, 1994, well after January 1994, Mary failed to demonstrate that she continued to call Principal, at Donald's request, after the date the certificates were sent. Moreover, Mary also testified that Donald was responsible for his own banking, bill paying and filing (Tr. at

---

[5] Under New York law, in order to establish a mailing, personal knowledge is required only to establish a regular office procedure; personal knowledge of the particular mailing is not required. *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir. 1985). More specifically:

> New York law holds that when, as here, there is proof of the office procedure followed in a regular course of business, and these procedures establish that the required notice has been properly addressed and mailed, a presumption arises that notice was received. The mere denial of receipt does not rebut that presumption. There must be -- in addition to denial of receipt -- some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable.

*Id*. Here, Heathcoate's personal knowledge of Principal's business practice to send all of the certificates, personal knowledge of Principal's business practice to follow-up continuously if

information is missing, and testimony regarding the computer entry, satisfies the requirements under New York law to establish a mailing.

8

87, 89). According to Mary, mail that came for Donald was opened by Donald, and she was not aware of what mail he received unless he told her. (Tr. at 88.) In addition, Mary testified that they shared a filing cabinet and she never found the certificate in their filing cabinet. However, Mary acknowledged that, "to the extent that Donald didn't want [her] to see something, the filing cabinet would not have been a good place to put it." (Tr. at 89). The Court finds Mary's testimony regarding her knowledge of her husband's record keeping insufficient to establish that Donald did not receive the certificate.

c. The Faxes

Mary argues that Principal could not have mailed the certificates because it did not have the names of co-annuitants for retirees whose annuity payments Principal took over in 1993. On September 15, 1993, June 29, 1994, and September 7, 1994[6], Principal faxed letters to Nationar requesting the names of contingent annuitants for people receiving a survivorship benefit. (Pl.'s Exs. 19, 26, 27.) A fourth fax was sent to Nationar on October 22, 1997, requesting the verification of the addresses of the Deferred Members listed on the first four pages of the fax, and the names of the co-annuitants of retirees listed on the other three pages. (Pl.'s Ex. 70.) On October 29, 1997, Nationar responded and returned the seven page fax to Principal, noting address changes for the Deferred Members and "beneficiary names who in all cases are spouses" for retirees. (Pl.'s Ex. 71.) Principal produced the fax pages containing the corrections to the addresses of Deferred Members, but Principal did not produce the remaining pages containing the list of the retirees' co-annuitants' names.

Mary argues that the Court should draw an adverse inference from Principal's failure to produce the remaining fax pages. "It is a well-established and long-standing principal of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). However, for an adverse inference to arise from the loss or destruction of evidence,

> the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed. This obligation to preserve evidence is relevant to litigation-most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation. Once a court has concluded that a party was under an obligation to

---

[6] The September 7, 1994 fax stated in pertinent part:

> I will issue certificates for all the members under contract. However, the people that we still do not have the names of the contingent annuitants for will not receive a certificate until these names are received. I have enclosed a listing showing the people receiving a benefit. I have highlighted the ones that we still need to receive a [sic] contingent annuitant names for. Please supply me with this information as soon as possible.

(Pl.'s Ex. 27.) Principal was unable to locate the three pages described in the above letter that were attached to the fax. (Tr. at 377.)

9

preserve the evidence that it destroyed, it must then consider whether the evidence was intentional destroyed, and the likely contents of that evidence.

*Id.* (internal citations omitted). However, in affirming an adverse inference instruction in a case where at least gross negligence was exhibited, the Second Circuit held "that a finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoilator with an adverse instruction." *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999).

Mary does not argue that the missing pages were intentionally destroyed or even that Principal exhibited gross negligence; rather, Mary argues that "there was a clear duty to preserve them" and that "it is odd that these documents were missing." (Pl. Post-Trial Brief at 23.) The missing documents were requested six and eight years after their creation. There is no indication that Principal intentionally or negligently destroyed the attachments. Nor has Mary demonstrated the likely contents of the certificates. Based on the facts in this case, the Court finds that these circumstances do not warrant that an adverse inference be drawn from the missing attachments.

Furthermore, there was no testimony elicited regarding the letter sent in 1997 seeking information on co-annuitants' names. However, Heathcoate testified that the purpose of the letter seeking the co-annuitants' names would not have been to issue certificates for the first time. (Tr. at 237.) The Court agrees and finds that the faxed letters and their missing pages do not demonstrate that Donald did not receive the certificate in 1994 as indicated by the computer entry and as required by Principal's regular business practice.

d. Mary's Survey of Other Employees

In an effort to determine whether other former employees of Savings Bank & Trust Company received annuity certificates, during the course of litigation in August and September 2003, Mary wrote to former employees, asking whether they received certificates. (Tr. at 89.) Mary produced a summary of the results that indicates that she attempted to contact thirty-four individuals, most of whom were personal acquaintances, through mail, e-mail or telephone. (Def.'s Ex. 9, Tr. 314-319, 327.) Mary, however, has no personal knowledge of whether the individuals who responded were actually correct or incorrect with respect to whether they received certificates. (Tr. at 334.) The individuals themselves did not testify whether the received the certificates. Of the individuals who responded to Mary, only Thomas Lackey[7] provided a copy of the annuity certificate that he received. (Def.'s Ex. 10.) Mary was unaware of when they retired, with the exception of Thomas Lackey, who she testified retired in 1982 (Tr. at 91.) Thomas Lackey's annuity certificate reveals that he retired prior to the annuity certificate being mailed, and Isabelle Lackey was named as his annuitant (Pl.'s Ex. 10). Principal objects to the admission of Mary's survey as a whole, arguing that the survey results are hearsay as they are being offered for the truth of the matter asserted. The Court agrees that the survey results are inadmissible hearsay.

However, even if this Court considered

---

[7] Of the thirty-four individuals contacted, only eight had co-annuitants. Mr. Lacky was on of the eight individuals who had a co-annuitant.

this survey, it does not change the Court's conclusion. In fact, while Mary asserts that annuity certificates could not have been mailed because Principal did not have any co-annuitants' names which were required to mail the annuity certificates, Thomas Lackey's annuity certificate evidences that Principal must have had at least some of this information at the time the annuity certificates were mailed in October 1994. No documentation has been produced evidencing that Principal possessed Isabelle Lackey's name in October, 1994, yet, based upon this annuity certificate, it is clear that Principal possessed at least some co-annuitants' names. Thus, the survey demonstrates that, prior to the mailing of all annuity certificates, Principal was in the possession of at least some co-annuitants' names which, given the passage of time, were not maintained. Therefore, to the extent Mary argues that Principal could not possibly have had co-annuitants' names, such as those to mail the certificates, the Thomas Lackey certificate undermines that categorical position.

Based on Heathcoate's testimony regarding Principal's normal business practices, the computer log indicating certificates were sent, and Mary's own testimony which fails to demonstrate Donald *could not* have received a certificate, the Court finds that Mary failed to demonstrate that the certificate was not sent to Donald Carlson.

Accordingly, because Principal (1) was not the recipient of ill-gotten trust assets; (2) did not have actual knowledge of the alleged unlawful transaction; and (3) did not have constructive knowledge of the alleged unlawful transaction, Principal is not liable in its non-fiduciary status as Mary cannot demonstrate any of the requirements under *Harris Trust* were met.[8]

### 2. THE NATIONAR RETIREMENT PLAN TERMINATED

Even if Principal was a proper defendant under *Harris Trust*, Mary failed to demonstrate that the Nationar plan did not properly terminate. "The Supreme Court has rejected the notion that wrongdoing that occurs after an ERISA plan has been properly terminated can give rise to a claim under § 502(a)(3)." *Carlson*, 320 F.3d at 308 (citing *Peacock v. Thomas*, 516 U.S. 349, 353 (1996).

It is undisputed that the Nationar plan terminated. Both the PBGC (Pl.'s Ex. 66) and the IRS (Def.'s Ex. 10) have acknowledged that the Nationar Retirement Plan terminated in September 1993. In addition, as is required by applicable law, the PBGC Forms 500 (Pl. Ex 9) and 501 (Pl.'s Ex. 8) were submitted to the PBGC.

However, Mary Carlson argues that the Nationar Retirement Plan did not *properly* terminate, alleging that neither she nor Donald Carlson received annuity certificates. To determine whether the plan terminated, the Second Circuit directed this Court to 29 U.S.C. § 1341(b)(2)(B). *See Carlson*, 320 F.3d at 308. The statute provides:

---

[8] To the extent plaintiff seeks admission of Pl.'s Exs. 77-80, the Court does not see their relevance to the determinations by this Court. Specifically, the views of the IRS in connection with the income tax regulation based on hypothetical facts, has no bearing on the issues before this Court and thus is irrelevant. Similarly, Principal's entire administrative file, Def.'s Ex. 1, does not appear to have any relevance. In any event, even if these documents were found relevant and admissible, it would not affect the findings by this Court.

(B) Notice to participants and beneficiaries of benefit commitments [liabilities]. No later than the date on which a notice is sent by the plan administrator under subparagraph (A), the plan administrator shall send a notice to each person who is a participant or beneficiary under the plan –

(i) specifying the amount of the benefit liabilities (if any) attributable to such person as of the proposed termination date and the benefit form on the basis of which such amount is determined, and

(ii) including the following information used in determinating such benefit liabilities:
(I) the length of service,
(II) the age of the participant or beneficiary,
(III) wages,
(IV) the assumptions, including the interest rate, and
(V) such other information as the corporation may require.

29 U.S.C. § 1341(b)(2)(B). In addition, the relevant portion of the regulations implementing the statute, 29 C.F.R. § 4021.28, Closeout of Plan, provides:

(d) Provisions of annuity contract. If plan benefits are provided through the purchase of irrevocable commitments - -

(1) Either the plan administrator or the insurer must, within 30 days after it is available, provide each participant and beneficiary with a copy of the annuity contract or certificate showing the insurer's name and address and clearly reflecting the insurer's obligation to provide the participant's or beneficiary's plan benefits; and

(2) If such a contract or certificate is not provided to the participant or beneficiary by the date on which the post-distribution certification is required to be filed in order to avoid the assessment of penalties under § 441.29(b), the plan administrator must, no later than that date, provide the participant and beneficiary with a notice that includes - -

(i) A statement that the obligations for providing the participant's or beneficiary's plan benefits has transferred to the insurer;

(ii) The name and address of the insurer;

(iii) The name, address and telephone number of the person designated by the insurer to answer questions concerning the annuity; and

(iv) A statement that the participant or beneficiary will receive from the plan administrator or insurer a copy of the annuity contract or a certificate showing the insurer's name and address and clearly reflecting the insurer's obligation to provide the participant's beneficiary's plan benefits [emphasis added].

Annuity certificates were not available when post-distribution certification was required to be filed, and as such, the requirements of 29 C.F.R. § 4041.28(d)(2) rather than § 4041.28(d)(1), apply. The plan administrator satisfied the requirements of 29 C.F.R. § 4041.28(d)(2) by correspondence dated

October 18, 1993. (Pl.'s Ex. 23). In that correspondence, Donald Carlson was notified (1) that the obligation has been transferred; (2) provided with the name and address of Principal Mutual Life Insurance Company; (3) provided with the name, address and telephone number of a person designated by the insurer to answer questions; and (4) advised that he would receive a certificate. (Second Stip. ¶ 33, Pl.'s Ex. 23.) Mary argues, however, that the plan does not terminate upon satisfying the requirements of 29 C.F.R. § 4041.28(d)(2) alone. Instead, Mary argues that Principal was required to mail the certificate described in 29 C.F.R. § 4041.28(d)(2) for the plan to terminate.

However, pursuant to Requirement 75 of PBGC Form 501, the form utilized by the PBGC to terminate plans, a copy of the annuity contract certificate *or* written notice must be provided to each participant and beneficiary receiving benefits in the form of an irrevocable commitment. Accordingly, the Court finds that a plan may be terminated either through the mailing of the annuity contract certificate or through the mailing of written notice. Furthermore, the Second Circuit advised, "[i]f . . . the Nationar Plan had already been terminated when its alleged duty to provide the certificate arose, then Principal's subsequent failure to provide Donald with the certificate would not give rise to an ERISA claim." *Carlson*, 320 F.3d at 308. By this language, the Second Circuit appears to be contemplating a circumstance whereby the plan was terminated without the sending of the certificate. Thus, the Court finds that the plan was terminated when notice was sent to Donald.

Even if, under the terms of § 4041 and 29 U.S.C. § 4041.28(d)(2), a statement that a copy of the annuity contract or certificate was forthcoming is not enough to terminate the plan, the Court finds, as stated *supra*, the evidence demonstrates that the annuity certificate was sent to Donald Carlson.

Mary further argues that pursuant to the terms of § 4041(b)(2)(B) which requires Notice must be sent "to each person who is a participant or beneficiary under the plan," the plan administrator was required to provide Mary with the same notice that was provided to Donald. In addition, 29 U.S.C. § 4041.28(d)(2) requires the plan administrator to "provide the participant and beneficiary with a notice." The Court finds, however, that the plan administrator is only required to send notice to beneficiaries who are currently receiving benefits at the time notice is sent. PBGC Form 501 (Pl.'s Ex. 8) refers to each participant and beneficiary receiving benefits. Thus, the notice must be sent to the individuals currently receiving benefits, not to future beneficiaries. (Tr. at 450). At the time this notice was sent, Mary was not receiving benefits; rather, she was, at best, a future beneficiary.

Accordingly, for the reasons stated above, the Court finds that the Nationar plan was properly terminated.

### C. Mary's Claims Under 29 U.S.C. § 1370

Mary argues that she is also entitled to relief pursuant to 29 U.S.C. § 1370, which applies to civil suits regarding the termination of single-employer plans and provides in relevant part:

> Any person who is with respect to a single-employer plan a . . . participant, or beneficiary, and is adversely affected by an act or practice of any

party (other than the corporation) in violation of any provision of . . . 29 U.S.C.S. § 1341 . . ., may bring an action (1) to enjoin such act or practice, or (2) to obtain other appropriate equitable relief (A) to redress such violation or (B) to enforce such provision.

Mary argues that, as a plan beneficiary, she was "adversely affected" by Principal's alleged failure to provide the certificate to Donald or herself because the failure deprived them of the last clear chance to detect and correct Nationar's error in purchasing the annuity from Principal. As stated above, the Court finds 1) that Principal was not required to send a certificate to Mary, and 2) Mary failed to establish that the certificate was not, in fact, provided to Donald.

Even assuming *arguendo* that the certificate was not sent to Donald or that Principal was required to mail a certificate to Mary and Eileen, Mary's claim under § 1370 must still fail. Principal is not a proper defendant under § 1370. An action pursuant to 29 U.S.C. § 1370 can only be brought against those parties involved in the termination of the plan, which does not include Principal. Principal was not responsible for meeting the requirements of terminating the plan pursuant to 29 U.S.C. §§ 1341 and 1342 and was not a contributory sponsor or employer subject to liability pursuant to 29 U.S.C. § 1361. Instead, it was Nationar, the plan administrator, who was responsible for meeting the requirements of the statute and who allegedly violated its provisions. Accordingly, Principal is not a proper defendant under this statute.

Furthermore, this claim is barred by the statute of limitations. The statute provides:

an action under this section may not be brought after the later of--
(A) 6 years after the date on which the cause of action arose, or
(B) 3 years after the applicable date specified in paragraph (2).
(2) Applicable date. (A) General rule. Except as provided in subparagraph (B), the applicable date specified in this paragraph is the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action.

29 U.S.C. § 1370(f). The alleged violation took place when the Nationar Plan was terminated in 1993. Mary asserts that the alleged violation was discovered in 1995, shortly after Donald's death. The Complaint in this action was filed on or around January 3, 2001. Accordingly, the applicable limitations period expired three years after Mary acquired knowledge of the violation in 1995. Relying on *Larsen v. NMU Pension Plan*, 902 F.2d 1069, 1074 (2d Cir. 1990), Mary argues that the limitations period did not expire until six years after Donald's death because, as a beneficiary, her cause of action could not arise before the participant's death. In *Larsen*, the Second Circuit applied the six-year limitations period adopted in *Miles v. New York State Teamsters Conference Pension Plan*, 698 F.2d 593, 598 (2d Cir.), cert. denied, 464 U.S. 829 (1983) for claims arising under ERISA's civil enforcement provision. *See Miles* 698 F.2d at 598 ("A plaintiff's ERISA cause of action accrues, and the six-year limitations period begins to run, when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries.") (internal quotation marks omitted). In calculating the date the statute of limitations began to run, the court in *Larsen* found that "[plaintiff] did not have any claim

as [her husband's] survivor while he was alive, so it was impossible for the Plan to repudiate her claim during that period." 902 F.2d at 1074. Based on that quote, Mary argues "[i]n this Circuit it is well settled that a beneficiary's cause of action cannot arise before the participant's death." (Pl.'s Post-Trial Brief at 43.) This Court finds, however, that Mary did have a cause of action under § 1370, for the alleged violation of the termination proceedings, prior to Donald's death. In *Larsen*, the Second Circuit was not addressing a cause of action under § 1370, but rather the court was applying a federal common law limitations period that provides only for a six-year period of limitations. With respect to § 1370, however, the limitations period is set forth by statute and provides alternative periods of six years and three years, adequately addressing a situation such as the one in the instant case where, although a beneficiary may have a claim, the putative beneficiary is not likely to acquire knowledge of the alleged violation until a later date. Furthermore, the statute was enacted to specifically address violations of termination proceedings and, thus, the Court finds that Mary did not have to wait until her husband's death to bring an action for a violation of those proceedings. Instead, the statute provides for an immediate avenue of redress for beneficiaries. Thus, even assuming Principal was a proper defendant under § 1370, Mary's claim is not timely as this action was filed approximately eight years after the cause of action arose (when the alleged violation took place) and approximately five years after Mary acquired knowledge of the alleged violation.

### D.   UNDER ERISA, MARY IS NOT ENTITLED TO THE RELIEF SOUGHT

Even if the Court found that ERISA was applicable to this action and that Principal was a proper defendant under ERISA, and that Mary's claim was timely, there is no relief which may be awarded to Mary against Principal. In *Mertens v. Hewitt Assoc.*, the Supreme Court held that compensatory damages are not recoverable under ERISA. 508 U.S. 248, (1993). In *Mertens*, a class of former employees who participated in the Kaiser Retirement Plan sued the plan's actuary for failure to adjust the plan's actuarial assumptions, causing the plan to be funded inadequately and terminated by the PBGC pursuant to 29 U.S.C. § 1341. As a result of the termination of the plan due to the inadequate funding, the retirees received only benefits guaranteed by ERISA, and not the substantially greater pensions due to them under the plan. The retirees sued the actuary, as a nonfiduciary, for money damages, alleging that the actuary knowingly participated in the fiduciaries' breach of fiduciary duty. More specifically, the petitioners in *Mertens* argued that the actuary should be required to "make the Kaiser plan whole for the losses resulting from its alleged knowing participation in the breach of fiduciary duty by the Kaiser plan's fiduciaries [which] would constitute 'other appropriate equitable relief' within the meaning of § 502(a)(3)." *Id.* at 253. The Supreme Court held, however, that "[a]lthough they often dance around the word, what petitioners in fact seek is nothing other than compensatory damages – monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties." *Id*. at 248.

Mary attempts to distinguish *Mertens*, arguing that the relief she seeks is reformation of the contract between Nationar and Principal. Mary is correct that reformation of contract has been found "an equitable remedy [that] is consistent with the remedial purposes

of ERISA." *Devito v. Pension Plan of Local 819 I.B.T. Pension Fund*, 975 F. Supp. 258, 267 (S.D.N.Y. 1997). However, though Mary attempts to cloak the relief sought as one for reformation of contract, as in *Mertens*, the Court finds that the remedy Mary actually seeks is compensatory damages. *See, e.g., Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006) (affirming the district court's holding that "an injunction requiring the defendants to restore funds to the defunct 401(k) plan to be distributed to participants, 'does not transform what is effectively a money damages request into equitable relief.'") (citing *Coan v. Kaufman*, 333 F. Supp. 2d 14, 26 (D. Conn. 2004)). Mary is currently receiving payment for the actuarial equivalent of 50% of Donald's benefits. What Mary seeks in the instant action is payment of 50% of Donald's benefits, as opposed to the actuarial equivalent of 50% of Donald's benefits that has resulted from Nationar's error. In short, Mary seeks compensation, from Principal, for the difference between the two calculations. *See Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 210 (2002) ("'Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.'") (quoting *Bowen v. Massachusetts*, 487 U.S. 879 (1998) (Scalia, J., dissenting)); *but see Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. , 126 S. Ct. 1869, 1873-1874, 164 L. Ed. 2d 612 (2006) (concluding that the relief sought by the insurance company was equitable because the funds were specifically identifiable and remained in the possession and control of the petitioners and were "not from the [petitioner's] assets generally").

Mary argues that the relief sought may also be termed "restitution in equity." The Court, however, disagrees. Restitution in equity is "ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great-West*, 534 U.S. at 213. Accordingly, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id; see also Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005) (stating that "restitution is measured by a defendant's unjust gain, rather than by a plaintiff's loss (internal quotation and alteration marks omitted)) (citing *Great-West,* 534 U.S. at 229 (Ginsburg, J., dissenting)); *Larue v. Dewolff, Boberg & Assocs.*, 450 F.3d 570, 575 (4th Cir. 2006) ("the absence of unjust possession is fatal to an equitable restitution claim"). Here, the funds to which Mary is claiming entitlement are not in Principal's possession. Nationar purchased a joint and survivor annuity for Donald Carlson providing a monthly benefit of $2,795.02 for his lifetime, with 100% of this amount, for a female, then age 75, who had a date of birth of October 4, 1918. Mary claims she is entitled to 50% of those funds, or $1397.51. However, because Nationar purchased the annuity based on Eileen's date of birth and not Mary's date of birth, and Mary is much younger than Eileen and thus has a longer life expectancy, Principal does not have funds available to pay 50% of Donald's Benefits to Mary for her lifetime. In spite of Mary's alleged loss, Principal did not gain from the transaction with Nationar such that Principal has additional funds available to which Mary is entitled. Had Nationar purchased an annuity

16

based on Mary's lifetime, the situation here would be different because then funds in good conscience belonging to Mary could be traced to particular funds in Principal's possession. That is not the case we have here. Principal was not unjustly enriched by the transaction with Nationar, and thus no restitution claim can lie against Principal. *See Mertens*, 508 U.S. at 322 ("In order to make out a claim for restitution, the plaintiff must show that the defendant has unjustly received from the plaintiff a benefit, such as a payment.") Because there are no plan assets from which Mary can recover, the only funds from which Mary can recover are Principal's own assets which is not authorized by ERISA. Accordingly, even if the Court found that ERISA was applicable to the present action, ERISA does not authorize the recovery of the funds sought.

### III. CONCLUSION

For the reasons set forth above, the Court finds in favor of the defendant. The Clerk of the Court is directed to enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 28, 2006
Central Islip, NY

\* \* \*

Counsel for plaintiff are Edgar Pauk, Esq., 144 East 44th St., New York, New York 10017 and Robert J. Bach, Esq., 60 East 42nd Street, New York, New York, 10165. Counsel for defendant is Randi K. Knepper, Esq. of McElroy, Deutsch, Mulvaney & Carpenter, LLP, 1300 Mt. Kemble Ave., Morristown, New Jersey 07960.